JUDGE CROTTY

12 CV 3187

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RECEIVED

APR 2 3 2012

U.S.D.C. S.D. N.Y.
CASHIERS

MARITIME ASSET MANAGEMENT, LLC,
on Behalf of Itself and All Others Similarly
Situated,

                      Plaintiff,

v.

NEUROGESX, INC. ANTHONY A.
DITONNO, STEPHEN F. GHIGLIERI, and
JEFFREY K. TOBIAS, M.D.,

                      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No.

**CLASS ACTION**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Maritime Asset Management, LLC ("Maritime"), by its counsel, hereby alleges

the following upon personal knowledge as to itself and its transactions in NeurogesX, Inc. stock,

and upon information and belief as to all else, based upon the investigation of counsel, including

the review and analysis of Defendants' filings with the United States Securities and Exchange

Commission (the "SEC"), Maritime's own investigation, news articles, and analyst reports:

### NATURE OF THE CLAIM

1.      This is a securities class action on behalf of all persons who purchased or

otherwise acquired the securities of NeurogesX, Inc. ("NeurogesX" or the "Company") between

May 9, 2011 through September 27, 2011, inclusive (the "Class Period"), against NeurogesX and

certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. §78a, et seq.  This action also encompasses claims on behalf of a

sub-class referred to as the Private Placement Class (defined below) that has also incurred

damages for violations of the Exchange Act, but that also has causes of action for breach of

contract, fraud and fraud in the inducement on behalf of investors who, like Maritime, purchased

shares from the Company on July 21, 2011 pursuant to a private placement.

2.     This action concerns misrepresentations and omissions concerning the continued employment of Defendant Dr. Jeffrey K. Tobias ("Tobias"), the Company's former Chief Medical Officer and Executive Vice President of Research and Development. As Chief Medical Officer and Executive Vice President, Defendant Tobias was a crucial officer for the Company, overseeing all the research and development for the drugs in the Company's portfolio. NeurogesX, as a biopharmaceutical company, is entirely dependent on generating revenue through the approval and sale of the drugs it develops.  Defendant Tobias's work was therefore of the utmost importance to the Company going forward.  Defendant Tobias was particularly important to the Company in light of the pending retirement in December 2011 of Defendant Anthony DiTonno, the Company's President and Chief Executive Officer.  Indeed, Defendant DiTonno has stated that Defendant Tobias was "instrumental" to the Company in public statements, and the Company alluded to its reliance on Defendant Tobias in two Form 10-Qs, filed with the SEC on May 9, 2011 and August 15, 2011, respectively, acknowledging the extent to which the Company was "highly dependent on the principal members of NeurogesX's management and commercial and scientific staff."

3.     Upon information and belief, since April 2011 Defendant Tobias had engaged in an extensive recruiting process to leave the Company and work for a competitor, Jazz Pharmaceuticals, Inc. ("Jazz").  Jazz's Chief Executive Officer, Bruce Cozadd, is a long-time acquaintance of Defendant Tobias.  Cozadd identified Defendant Tobias as the first choice candidate to be Jazz's new Executive Vice President, Research and Development and Chief Medical Officer.  Defendant Tobias then underwent an extensive recruiting and interviewing process with Jazz executives and its board of directors throughout the spring and summer of 2011.

4.     On July 21, 2011, Maritime and twenty other individual and institutional investors entered into a Securities Purchase Agreement (the "SPA") to purchase shares and warrants of the Company in a private placement.  Of paramount importance to Maritime and the other investors participating in the SPA was the assurance that Defendant Tobias would continue on in his current capacity at the Company as Chief Medical Officer and Executive Vice President.  Just days before entering into the SPA, Andrew Evans, an analyst at Maritime, had two conversations with Defendant Tobias, one on a due diligence call arranged by the Company's underwriter, Leerink Swan, which included Defendant Tobias and other members of NeurogesX's management, and the other a direct telephone conversation.  On both of those calls, in response to a direct question, Defendant Tobias stated that he had no plans to leave the Company.  Additionally, the SPA contains a provision which also states that "[t]he Company is not aware that any key employee or significant group of employees of the Company or the Subsidiary plans to terminate employment with the Company."  This provision and the entire SPA were made public when the SPA was included as an exhibit to a press release issued by the Company on July 27, 2011.  In other public statements during the Class Period, the Company failed to disclose that Defendant Tobias was actively seeking to leave NeurogesX, despite his critical importance to the future success of the Company.

5.     Contrary to the direct representations of Defendant Tobias in his capacity as an officer of the Company and public statements made on the Company's behalf that Defendant Tobias would remain a member of NeurogesX's management, Tobias in fact had an intention from April 2011 to leave NeurogesX.  On September 27, 2011, NeurogesX finally announced that Defendant Tobias had tendered his resignation with the Company on September 21, 2011.

The release did not disclose, however, that Defendant Tobias had already accepted a job with NeurogesX's competitor Jazz.

6.     Given the importance of Defendant Tobias, the market reaction to his resignation was severe.  NeurogesX stock rapidly declined by almost forty percent, and by October 3, 2011, the Company had lost over half its market value.  This market reaction confirms the importance Defendant Tobias played at the Company and the materiality of his continued employment.  Had Maritime and the other investors been aware that Defendant Tobias intended to leave the Company, they never would have invested in the Company.

7.     The material misrepresentations and omissions prevented investors and analysts alike from knowing the truth about the impending departure of Defendant Tobias, which caused the Company's stock to trade at artificially inflated prices throughout the Class Period.  However, after the above revelations were made to the market, the Company's shares suffered massive declines, sending them down over 50% from their Class Period high.

## JURISDICTION AND VENUE

8.     The federal law claims asserted herein arise under section 10(b) and section 20(a) of the Exchange Act, 15 U.S.C. section 78j(b) and section 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. section 240.10b-5, as well as under the common law.

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 and section 27 of the Exchange Act.

10.     This Court has supplemental jurisdiction over the state common law claims in this action pursuant to 28 U.S.C. section 1367.

11.     This Court has jurisdiction over each defendant named herein because each defendant is an individual who has sufficient minimum contacts with this District so as to render

the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

12.    Venue is proper in this Court pursuant to 28 U.S.C. section 1391(a) and section 27 of the Exchange Act because NeurogesX trades on the NASDAQ GM exchange, which is located in this District.  Furthermore, at all times relevant to this action, many of the acts and transactions alleged herein occurred in substantial part in this District.  Additionally, the SPA entered into by the Private Placement Class (defined below) contains a choice of law provision stating the contract be enforced in accordance with the laws of the State of New York, and that confers exclusive jurisdiction in the New York Courts.  Finally, upon information and belief, the following institutional investors who participated in the private placement on July 21, 2011 are located in this District: Deerfield Management Company L.P., Iroquois Master Fund Ltd., and Kingsbrook Opportunities Master Fund LP.

## THE PARTIES

13.    Plaintiff Maritime Asset Management purchased NeurogesX's securities as set forth herein and in its certification filed herewith.

14.    Defendant NeurogesX is a California corporation with its principal place of business located at 2215 Bridgepointe Parkway, Suite 200, San Mateo, CA 94404.

15.    Defendant Anthony DiTonno ("DiTonno") was at all relevant times during the Class Period the Company's President and Chief Executive Officer ("CEO").  DiTonno retired as CEO of the Company on December 31, 2011.  In his capacity as CEO of NeurogesX, Defendant DiTonno had general authority over all matters relating to the business and affairs of the Company, including, among other things, the dissemination of information regarding the Company's operations, financial condition, performance, and growth.  Defendant DiTonno

participated in the Company's issuance of the false and misleading press release during the Class Period.

16.     Defendant Stephen F. Ghiglieri ("Ghiglieri") was at all relevant times during the Class Period the Company's Executive Vice President, Chief Operating Officer ("COO") and Chief Financial Officer ("CFO").   In his capacity as CFO of NeurogesX, Defendant Ghiglieri had general authority over all matters relating to the business and affairs of the Company, including, among other things, the dissemination of information regarding the Company's operations, financial condition, performance, and growth.   Defendant Ghiglieri participated in the Company's issuance of the false and misleading press release during the Class Period.

17.     Defendant Dr. Joseph Tobias was at all relevant times during the Class Period the Company's Chief Medical Officer and Executive Vice President for of Research and Development.

18.     Defendants NeurogesX, DiTonno, Ghiglieri and Tobias are collectively referred to hereinafter as the "Defendants."   Defendants DiTonno, Ghiglieriand Tobias are collectively referred to hereinafter as the "Individual Defendants."

19.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of NeurogesX's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein

had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FURTHER SUBSTANTIVE ALLEGATIONS

**NeurogesX and Defendant Tobias.**

20.     NeurogesX is a biopharmaceutical company that focuses on developing and commercializing pain management therapies. Qutenza is the Company's lead product and was approved by the U.S. Food and Drug Administration in November 2009 and by the European Medicines Agency in May 2009. According to the Company's website, it currently has seven other drugs in its product pipeline at various stages of approval.

21.     The biopharmaceutical industry is a highly competitive industry, and the hiring and retention of key medical employees is critical in maintaining the competitive edge, producing successful products, and maintaining confidence in the company's mission. Therefore it was of the utmost importance that the Company retain someone of Defendant Tobias's experience and reputation.

22.     The Company was well aware of the importance of Defendant Tobias. In a press release announcing Defendant Tobias's promotion to Executive Vice President dated February 4, 2010, Defendant DiTonno is quoted as saying that Defendant Tobias's leadership "will be instrumental as [NeurogesX] prepare[s] for the successful U.S. and E.U. commercialization of Qutenza, as well as further advancement of NGX-1998, later this year."

23.     On April 29, 2011, the Company announced the planned retirement of Anthony DiTonno, the Company's President and Chief Executive Officer, by December 31, 2011. The Company also announced that it had entered into amended and restated employment agreements

with the Company's named executive officers, including Defendants DiTonno, Tobias, and Ghiglieri, and that the Board also approved bonuses for, amongst others, Defendants Ghiglieri and Tobias. These bonuses include cash compensation of $100,000 for each executive officer provided he remained employed with the Company for 12 months following April 27, 2011, and equity compensation in the form of an option grant under the Company's 2007 Stock Plan, as amended (the "2007 Plan"), to each executive officer for 75,000 shares of common stock that vest as to 50% of such shares if such executive officer remains employed with the Company for six months following April 27, 2011 and the remaining 50% if such executive officer remains employed with the Company for two years following April 27, 2011.

**Jazz and Defendant Tobias Recruitment.**

24.     Jazz, like NeurogesX, is a biopharmaceutical company.  Jazz is headquartered in Dublin, Ireland, but has an office located in Palo Alto, California, a short drive from NeurogesX's headquarters.  Bruce Cozadd is Jazz's Chief Executive Officer and has known Defendant Tobias for at least several years.  In March 2011, Cozadd identified a need to recruit a new Chief Medical Officer for Jazz.  In Cozadd's opinion there was no internal candidate with the requisite experience and skills for this position so that an external appointment would be required.  Furthermore, Cozadd identified Defendant Tobias as his first choice for this position. Although Cozadd recognized that Defendant Tobias was a suitable candidate for the position, he also recognized that he had to go through a formal recruiting process and involve Jazz's board of directors in that process.  These facts, as well as other facts regarding the recruiting process for Tobias set forth below, have been confirmed by Cozadd in a conversation with Andrew Evans on November 28, 2011 at the Piper Jaffrey Healthcare Conference, held in New York, New York.

25.     Accordingly, in March 2011, Jazz retained Spencer Stuart, a leading global executive firm, to commence a search for a new Chief Medical Officer.  From the beginning of the search, which began in April 2011, Defendant Tobias was the lead candidate for the position and he remained the lead candidate until he was formally offered the position on September 16, 2011.

26.     According to Cozadd, the recruitment of Defendant Tobias took place "throughout the spring and summer" of 2011, including multiple meetings with Jazz management and board of directors.  Jazz management also introduced Defendant Tobias to the management of Azur Pharma Ltd., a company with whom Jazz was in the process of consummating a merger.  According to Cozadd, Azur and Defendant Tobias had been "working together for some time before [Tobias] came aboard Jazz officially."  Indeed, at the Piper Jaffrey Healthcare Conference on November 28, 2011, Cozadd was already describing Defendant Tobias as the backbone of Jazz.

**NeurogesX Misrepresentations – May 9, 2011 Form 10-Q.**

27.     On May 9, 2011, the Company filed a Form 10-Q ("10-Q") with the SEC.  The 10-Q stated the following:

> ***We depend on our key personnel. If we are not able to retain them, our business will suffer.***
>
> We are highly dependent on the principal members of our management and scientific staff. The competition for skilled personnel among biopharmaceutical companies in the San Francisco Bay Area is intense and the employment services of our scientific, management and other executive officers are terminable at-will. If we lose one or more of these key employees, our ability to implement and execute our business strategy successfully could be seriously harmed. Replacing key employees may be difficult and may take an extended period of time because of the limited number of individuals in our industry with the breadth of skills and experience required to develop, gain regulatory approval of and commercialize products successfully.

28.     This representation made in the 10-Q recognizes the importance and materiality of key employees, including Defendant Tobias, to the Company.   The Company failed to disclose that, according to Cozadd, Defendant Tobias was already actively seeking to leave NeurogesX for Jazz at this time.

**NeurogesX Misrepresentations - July 2011 Private Placement.**

29.     Also during the summer of 2011, the Company was soliciting investors for a private placement of its securities.  Following the late withdrawal of one of the investors in the private placement, on July 17, 2011, Maritime was approached to participate.  Of key importance to Maritime was the assurance that Defendant Tobias would remain with the Company, since he was widely regarded as the key driver to any future growth and success at the Company.  On July 19, 2011, in response to Maritime's request, Leerink Swann, NeurogesX's underwriter, arranged a due diligence call with NeurogesX's management team, including Defendant Tobias. Andrew Evans participated on the call for Maritime.  Defendant Tobias participated in this conference call as a representative of the Company.  In response to a direct question, Defendant Tobias stated that he had no plans to leave the Company.  On information and belief, each of the other investors in the private placement had a similar conversation, either in person or by telephone, with Defendant Tobias and received the same representation.

30.     Later on July 19 or July 20, 2011, Andrew Evans telephoned Defendant Tobias directly. During this telephone call, Defendant Tobias repeated his prior representation that he had no intention of leaving the Company. Defendant Tobias made this representation even though at this time he was already significantly advanced in the process of leaving NeurogesX for Jazz.

31.     On July 21, 2011, the Company entered into the private placement, where it privately sold shares to Maritime and twenty other investors pursuant to a Securities Purchase Agreement ("SPA") in which it agreed to sell 11,749,552 shares of common stock and warrants to purchase 5,874,782 shares of common stock.  The private placement yielded approximately $20.2 million before deduction of placement agent fees and other transaction expenses.  Maritime's portion of the private placement consisted of 872,093 common shares and accompanying warrants at a cost of $1,500,000.

32.     In addition to Defendant Tobias's representations made in the presence of NeurogesX's management, NeurogesX warranted in the SPA that "[t]he Company is not aware that any key employee or significant group of employees of the Company or the Subsidiary plans to terminate employment with the Company."

33.     The SPA became public on July 27, 2011, filed as an exhibit to a Form 8-K filed with the SEC.

34.     NeurogesX acknowledged in the SPA that Maritime and the other investors were relying on the foregoing representations and affirmed that the representations were "true and correct in all material respects and [did] not contain any untrue statements of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading."

35.     Therefore, the Company was well aware and acknowledged the importance and materiality of retaining key employees, particularly those who are involved in the development of medical products, most significantly Defendant Tobias.

36.     Following the completion of the secondary offering, on August 5, 2011 the Company also secured a $20 million debt facility, which includes a $5 million accounts

receivable line of credit and a $15 million term loan.  This debt facility was announced in a Form 8-K, filed with the SEC, on August 8, 2011.  Again, Defendants did not make any representations that Tobias was actively looking to leave the Company, since doing so would jeopardize its ability to obtain the debt facility.

**NeurogesX Misrepresentations – August 15, 2011 Form 10-Q.**

37.     On August 15, 2011, the Company filed a Form 10-Q with the SEC.  The 10-Q stated the following:

> *We depend on our key personnel. If we are not able to retain them, our business will suffer.*
>
> We are highly dependent on the principal members of our management and scientific staff. The competition for skilled personnel among biopharmaceutical companies in the San Francisco Bay Area is intense and the employment services of our scientific, management and other executive officers are terminable at-will. If we lose one or more of these key employees, our ability to implement and execute our business strategy successfully could be seriously harmed. Replacing key employees may be difficult and may take an extended period of time because of the limited number of individuals in our industry with the breadth of skills and experience required to develop, gain regulatory approval of and commercialize products successfully.

38.     This representation made in the 10-Q recognizes the importance and materiality of key employees, including Defendant Tobias, to the Company.  The Company failed to disclose that Defendant Tobias was actively seeking to leave NeurogesX for Jazz  at this time.

39.     The statements made in paragraphs ¶¶ 27, 29, 32, 34, and 37 were false because the Defendants failed to disclose that from April 2011, Tobias was actively looking to leave NeurogesX for Jazz and had no commitment to stay at NeurogesX.

## **THE TRUTH IS REVEALED**

40.     On September 16 , 2011, Jazz formally offered Defendant Tobias a position as its Chief Medical Officer.

41.    On September 21, 2011, Dr. Tobias purportedly informed the company of his resignation.

42.    On September 27, 2011, NeurogesX filed a press release on a Form 8-K, announcing that Defendant Tobias resigned his position with the Company.  The Company did not disclose, however, that Defendant Tobias had already accepted the position of Senior Vice President of Research & Development and Chief Medical Officer of Jazz.  Defendant Tobias's resignation went into effect on October 15, 2011.

43.    The market reacted negatively to Defendant Tobias's resignation.  NeurogesX stock rapidly declined almost 40 percent on heavy trading volume, and continued to decline thereafter.  By October 3, 2011, the Company had lost over half its market value.  In fact, the Company's stock has been performing so poorly that NASDAQ announced on February 9, 2012 that it halted trading on the Company's common stock.

44.    On October 31, 2011, the Company announced that it was replacing Defendant Tobias with Dr. Stephen J. Petroutka.

## ADDITIONAL SCIENTER ALLEGATIONS

45.    As alleged herein, Defendant Tobias acted with scienter as he had formed an intent as of April 2011 to leave NeurogesX for Jazz and had no intention to stay employed as NeurogesX's Chief Medical Officer.  Therefore, he knew his representations to the contrary during the due diligence for the July 2011 private placement were false and misleading.  Furthermore, he knew that the representations made by the Company during the Class Period regarding his continued employment with NeurogesX were also false and misleading.  As an officer of the Company, Defendant Tobias's knowledge is also imputed to NeurogesX.

46.    As alleged herein, the other Individual Defendants acted with scienter in that they

13

knew or disregarded with deliberate recklessness that the public documents and statements, issued or disseminated in the name of the Company, were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents. As set forth elsewhere herein in detail throughout this complaint, Defendants, by virtue of their receipt of information reflecting the true facts regarding NeurogesX and Defendant Tobias's plan to leave, their control over, and/or receipt, and/or modification of NeurogesX's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning NeurogesX, participated in the fraudulent scheme alleged herein.

47.     The small size of NeurogesX and its executive team, the importance of Defendant Tobias and the proximity of Jazz to NeurogesX's offices means it may be strongly inferred that the other Individual Defendants, all members of NeurogesX management, were also aware of his discussions with Jazz. The prompt announcement that the Company was replacing Defendant Tobias with Dr. Stephen J. Petroutka on October 31, 2011 further suggests that NeurogesX management and its Board had significant advance notice of Defendant Tobias's departure, while still keeping it hidden from investors such as Maritime.

48.     Indeed, the Company's own filings with the SEC highly suggest that it is not feasible to select a replacement for Defendant Tobias in such short order.  In the 10-Qs issued on May 9, 2011 and August 15, 2011, respectively, the Company gave an example of the time and due diligence required to replace an executive.  The 10-Qs stated:

> If we lose one or more of these key employees, our ability to implement and execute our business strategy successfully could be seriously harmed. Replacing key employees may be difficult and may take an extended period of time because of the limited number of individuals in our industry with the breadth of skills and

14

experience required to develop, gain regulatory approval of and commercialize products successfully. ***For example, on April 29, 2011, we announced the planned retirement of Anthony DiTonno, our President and Chief Executive Officer, by December 31, 2011. We initiated a formal executive search for a Chief Executive Officer, however there can be no assurance that our search will be successful in identifying a proper candidate, that a candidate will accept the position on terms acceptable to us or how long such a search will take to perform*** . . . .

49.     Given that the Company expressed concerns that it would be unable to find a suitable replacement for its outgoing Chief Executive Officer during a period of more than seven months, it is highly unlikely that it would be able to have found a suitable replacement for its outgoing Chief Medical Officer and Executive Vice President in a little over a month.  This evidence is highly suggestive that Defendants DiTonno and Ghiglieri were well aware of Defendant Tobias's pending departure during the summer of 2011 and planned for it, yet failed to notify the investing public of such a change.  Quite the contrary, the Company affirmatively disavowed that any employee was planning on leaving the Company in the SPA, which was made public on July 27, 2011.

50.     The facts alleged herein compel a strong inference that the Individual Defendants, the Company's senior management, knew about Defendant Tobias's plan to leave the Company and decided to withhold that information from the market.  While this information was withheld from the market and NeurogesX's stock price was artificially inflated, the Individual Defendants and NeurogesX decided to raise capital through the secondary offering on July 21, 2011 and the August 2011 debt facility, capital that NeurogesX would have been unable to raise if the truth about Defendant Tobias's plan to leave the Company had been publicly disclosed.  Defendants were thus motivated to perpetuate the fraudulent scheme and course of conduct described herein.

## LOSS CAUSATION

51.     During the Class Period, as detailed herein, the Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of NeurogesX's securities and operated as a fraud or deceit on Class Period purchasers of NeurogesX securities by materially misleading the investing public. Later, when the Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of NeurogesX's securities fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of NeurogesX's securities during the Class Period, plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## FRAUD-ON-THE-MARKET DOCTRINE

52.     At all relevant times, the market for NeurogesX's securities was an efficient market for the following reasons, among others:

a)     NeurogesX securities met the requirements for listing, and was listed and actively traded on the NASDAQ GM,a highly efficient and automated market;

b)     NeurogesX filed periodic public reports with the SEC and the NASDAQ GM; and

c)     NeurogesX regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

53.     As a result of the foregoing, the market for NeurogesX's securities promptly digested current information regarding NeurogesX from all publicly available sources and

reflected such information in the prices of the securities. Under these circumstances, all purchasers of NeurogesX securities during the Class Period suffered similar injury through their purchase of NeurogesX securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

54.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of NeurogesX who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired NeurogesX securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times,

members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

56.   Plaintiff also brings this action on behalf of a subclass of persons who purchased or otherwise acquired NeurogesX securities on July 21, 2011 pursuant to the SPA (the "Private Placement Class") (together with the Class, the "Classes").   Excluded from the Private Placement Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

57.   The members of the Class are so numerous that joinder of all members is impracticable, since NeurogesX has millions of shares of stock outstanding and because the Company's shares were actively traded on the NASDAQ GM Stock Exchange.   As of October 31, 2011, NeurogesX had over 29 million shares issued and outstanding.   While the exact number of Class members in unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.   Members of the Private Placement Class number twenty-one entities or individuals.

58.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes which predominate over questions which may affect individual Class and Private Placement Class members include:

      a)   whether the Exchange Act was violated by Defendants;

      b)   whether Defendants omitted and/or misrepresented material facts in their publicly disseminated press releases and statements during the Class Period;

    c)   whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    d)   whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

    e)   whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

    f)   whether the price of NeurogesX securities was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

    g)   whether the members of the Classes have sustained damages as a result of the decline in value of NeurogesX's stock when the truth was revealed, and if so, what is the appropriate measure of damages.

59.   Additionally, there may be certain questions of law and fact that are common to the Private Placement Class that are not common to the Class members, including:

    a)   whether Defendants breached their contract with the Private Placement Class;

    b)   whether Defendants violated the applicable common law as a result of their omission and/or misrepresentation of material facts; and

    c)   whether Defendants omitted and/or misrepresented material facts in the private placement and statements made in connection with the solicitation and/or execution of the private placement.

60.     Plaintiff's claims are typical of those of the Classes because Plaintiff and the Classes sustained damages from Defendants' wrongful conduct in a substantially identical manner.

61.     Plaintiff will adequately protect the interests of the Classes and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Classes.

62.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**
**Against Defendants Tobias and NeurogesX for Fraud In the Inducement**
**(on behalf of Maritime individually)**

63.     Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 to 54 above, as though fully set forth herein.

64.     Defendant Tobias induced Plaintiff into executing the SPA based upon the false representation that he did not intend to leave the Company.

65.     When Defendant Tobias, as duly authorized agent of NeurogesX, made those false statements, other members of NeurogesX's management were present and did not dispute or correct those statements.

66.     Defendant Tobias made those representations aware of their falsity, but Defendant Tobias and the rest of NeurogesX's management knew that the only way to induce Plaintiff to execute the SPA was by making such a promise.

67.     Plaintiff believed and justifiably relied upon the statements made by Defendant Tobias and was induced by those statements to execute the SPA.

68.     Plaintiff, because of its reliance upon Defendant Tobias's representation, has suffered losses in connection with the shares and warrants purchased pursuant to the SPA.

**COUNT II**
**Against NeurogesX for Violation of Section 10(b) of the**
**Exchange Act and SEC Rule 10b-5**
**(on behalf of the Classes)**

69.     Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 to 62 above, as though fully set forth herein.

70.     During the Class Period, Defendant NeurogesX made the false statements specified above, which it knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71.     Defendant NeurogesX violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that it:

        a)  employed devices, schemes, and artifices to defraud;

        b)  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        c)  engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of NeurogesX's securities during the Class Period.

72.     NeurogesX is liable as a primary violator in making false and misleading statements, and for participating in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of NeurogesX stock during the Class Period.  NeurogesX had a

motive to pursue a fraudulent scheme in furtherance of their common goal, *i.e.*, inflating the trading price of NeurogesX stock by making false and misleading statements and concealing material adverse information. The fraudulent scheme and course of business was designed to and did: (i) deceive the investing public, including Plaintiff and other members of the Classes; (ii) artificially inflate the prices of NeurogesX stock during the Class Period; (iii) cause Plaintiff and other members of the Classes to purchase NeurogesX stock at inflated prices; and (iv) substantially cause the severe decline in NeurogesX's stock price as the artificial inflation was released.

73.     Plaintiff and the Classes have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for NeurogesX's securities. Plaintiff and the Classes would not have purchased NeurogesX's securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.  As a result of NeurogesX's false statements, NeurogesX securities traded at inflated prices during the Class Period, causing millions of dollars of damages to the Class when the truth was revealed and the artificial inflation was released from NeurogesX's stock price.

## COUNT III
### Against Individual Defendants for Violation of Section 20(a) of the Exchange Act
### (on behalf of the Classes)

74.     Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 to 62 and 69 to 73 above, as though fully set forth herein.

75.     During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of NeurogesX, were privy to non-public information concerning Defendant Tobias's plans to leave NeurogesX via access to internal corporate documents,

conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiff and other members of the Classes had no access to such information, which was, and remains solely under the control of the Defendants.

76. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

77. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of NeurogesX's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, each of the

Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of NeurogesX's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

78.     Individual Defendants acted as controlling persons of NeurogesX within the meaning of section 20(a) of the Exchange Act. By reason of their positions with the Company, Individual Defendants had the power and authority to cause NeurogesX to engage in the wrongful conduct complained of herein.  Individual Defendants controlled NeurogesX and all of its employees. As alleged above, NeurogesX is a primary violator of section 10(b) of the Exchange Act and SEC Rule 10b-5.  By reason of their conduct, Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

79.     As a direct and proximate result of the wrongful conduct of NeurogesX and Individual Defendants, Plaintiff and members of the Classes suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT IV**
**Against Defendant DiTonno and NeurogesX for Breach of Contract**
**(on behalf of the Private Placement Class)**

80.     Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 to 62 above, as though fully set forth herein.

81.     Plaintiff and the Private Placement Class entered into contracts, the SPAs, with the Company whereby they purchased stocks and warrants from the Company.

82.     The SPAs contained an express representation clause which stated that the Company was not aware of any key personnel planning to terminate employment with the Company.

83.     The Defendants breached the contract by failing to disclose when the contract was executed that Defendant Tobias, a key personnel of NeurogesX,was planning to terminate his employment.

84.     As a direct and proximate result of Defendants' breach of the SPAs, Plaintiff and the Private Placement Class suffered damages in connection with their respective purchases of the Company's securities.

### COUNT V
### Against Defendants for Fraud
### (on behalf of the Private Placement Class)

85.     Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 to 62 above, as though fully set forth herein.

86.     At all material times, Defendants had actual knowledge that their written statements in the SPA and the oral representations of Defendant Tobias concerning his plans to terminate employment with the Company were false statements of material fact which were false when made and known by said Defendants to be false when made.

87.     Defendants made and/or failed to correct the false statements with the intent that Plaintiff and the Private Placement Class rely on those false statements.  Plaintiff and the Private Placement Class were unaware of Defendants' intent to defraud Plaintiff and the Private Placement Class.

88.     Plaintiff and the Private Placement Class believed and justifiably relied upon Defendants' false statements.

89.     The fraudulent conduct engaged in by Defendants constitutes a separate and independent tort separate and apart from any breach of any contract.

90.     As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff and the Private Placement Class suffered damages in connection with their respective purchases of the Company's securities.

**COUNT VI**
**Aiding and Abetting**
**(Against the Individual Defendants)**

91.     Plaintiff repeats all previous allegations as if set forth in full herein.

92.     As alleged in more detail above, the Individual Defendants have aided and abetted NeurogesX's fraud.

93.     As a result, Plaintiff and the members of the Classes have been harmed.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class;

B.      Awarding Plaintiff and the members of the Classes damages, including interest;

C.      Rescinding the SPA entered into by the Private Placement Class and the Company and returning the principal paid by all members of the Private Placement Class;

C.       Awarding Plaintiff reasonable costs and attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury.

26

Dated April 20, 2012.  **LEVI & KORSINSKY LLP**

Eduard Korsinsky
30 Broad Street
24th Floor
New York, NY 10004
Tel: (212)363-7500
Fax: (212) 363-7171

Nicholas I. Porritt
Thomas M. Gottschlich
LEVI & KORSINSKY LLP
1101 30th Street, NW
Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121

27