1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

7

**NORTHERN DISTRICT OF CALIFORNIA**

8
9

**MARITIME ASSET MANAGEMENT, LLC,**

10
      **Plaintiff,**

11
      **vs.**

12

**NEUROGESX, INC., ANTHONY A. DITONNO,**
**STEPHEN F. GHIGLIERI, AND JEFFREY**
13
**TOBIAS, M.D.,**

14
      **Defendants.**

15

**Case No.: 12-CV-5034 YGR**

**ORDER GRANTING WITH LEAVE TO AMEND**
**MOTIONS TO DISMISS OF: (1) DEFENDANT**
**JEFFREY TOBIAS, M.D. AND (2) DEFENDANTS**
**NEUROGESX, INC., ANTHONY A. DITONNO,**
**AND STEPHEN F. GHIGLIERI**

16
17

      Presently before the court are two motions: the Motion of Defendant Jeffrey Tobias, M.D. to

18
Dismiss Plaintiff's Complaint (Dkt. No. 36) and Motion of Defendants NeurogesX, Inc., Anthony A.

DiTonno, and Stephen F. Ghiglieri (collectively, "the NeurogesX Defendants") to Dismiss Plaintiffs'
19
Complaint (Dkt. No. 33).  Plaintiffs' action alleges misrepresentations and omissions concerning a
20
key employee's plans to remain with the company, specifically Dr. Joseph Tobias, NeurogesX's
21
Chief Medical Officer and Executive Vice President of Research and Development.  Plaintiffs here

22
are the NeurogesX Investor Group, comprised of Maritime Asset Management ("Maritime") and

Ophir Keynan.  Plaintiffs allege that they represent a class of all persons who purchased or acquired
23
the securities of NeurogesX, Inc. ("NeurogesX" or "the Company") between May 9, 2011 and
24
September 27, 2011, as well as a sub-class referred to as the "Private Placement Class" taht
25
purchased shares from NeurogesX on July 21, 2011 pursuant to a private placement agreement.
26

      Plaintiffs allege six counts: (I) Fraud In the Inducement (against all defendants on behalf of
27
lead plaintiff, Maritime, individually); (II) Violation of Section 10(b) of the Exchange Act and Rule
28

10b-5 of the Securities and Exchange Commission ("SEC") (against NeurogesX on behalf of both the classes);  (III) Violation of Section 20(a) of the Exchange Act (against individual defendants on behalf of all the Classes); (IV) Breach of Contract (against defendants DiTonno and NeurogesX on behalf of the Private Placement Class); (V) Fraud (against all defendants on behalf of the Private Placement Class); and (VI) Aiding and abetting (against all individual defendants) on behalf both classes.[1]

Defendants move to dismiss the claims alleged on the grounds of: failure to allege sufficiently a false or misleading statement, scienter, or reliance; preemption of state law class claims by the Securities Litigation Uniform Standards Act ("SLUSA"); and legal inability to allege conspiracy as between an employee and his corporate employer.

Having carefully considered the papers submitted and the pleadings in this action, the oral arguments, and the matters properly subject to judicial notice,[2] and for the reasons stated herein, the Court **ORDERS** as follows:

The Motion of the NeurogesX Defendants is **GRANTED WITH LEAVE TO AMEND** on the grounds that the allegations of securities fraud do not meet the stringent standards applicable thereto, the state law class claims are preempted by federal securities law, and the state law claim on behalf of Maritime individually does not allege fraud sufficiently per Federal Rule of Civil Procedure 9(b).

Likewise, the Motion of Tobias to dismiss is **GRANTED WITH LEAVE TO AMEND** on the grounds that the underlying 10(b) violation is insufficiently pleaded and the state law class claims are preempted.

# I.     BACKGROUND

The following is a summary of the allegations in Plaintiff's First Amended Complaint ("FAC"),[3] which the Court accepts as true for purposes of these motions to dismiss.  NeurogesX is a

---

[1] Plaintiff concedes that Count VI is improperly pleaded in that it should have been asserted only on behalf of the Private Placement Class.  (Opp'n at 15 n.2.)

[2] Defendant Neurogesx seeks judicial notice of the SPA, as well as several forms filed with the SEC.  (Dkt. No. 34, 35.)  These matters are proper subjects of judicial notice and the request is **GRANTED**.

biopharmaceutical company with one product, Qutenza, approved in both the United States and Europe in 2009, and seven other drugs at various stages in development.  Anthony A. DiTonno was NeurogesX's President and Chief Executive Officer until he retired on December 31, 2011. Stephen F. Ghiglieri is the company's Chief Operating Officer and Chief Financial Officer.  Dr. Jeffrey K. Tobias was, before his departure, NeurogesX's Chief Medical Officer and Executive Vice President of Research and Development.  Defendant Tobias was promoted to Executive Vice President of Research and Development and Chief Medical Officer in early 2010, at which time DiTonno was quoted as saying that Tobias's leadership "will be instrumental as [NeurogesX] prepare[s] for the successful U.S. and E.U. commercialization of Qutenza, as well as further advancement of NGX-1998, later this year."  (*Id.* ¶ 24.)

On April 29, 2011, the Company announced the planned retirement of DiTonno by December 31, 2011.  At the same time it announced a new employment agreement with Tobias, including a cash bonus of $100,000 and 75,000 shares of common stock that would vest as to 50% if he remained employed with NeurogesX for six months, and the other 50% if he stayed for two years. (FAC ¶ 25.)  Investors were told that NeurogesX had entered into amended employment agreements designed to encourage several executives to stay with NeurogesX in the wake of DiTonno's announcement. (FAC ¶ 25.)

Meanwhile, in March 2011, Jazz Pharmaceuticals ("Jazz"), a competing biopharmaceutical company, began recruiting for a new Chief Medical Officer.  (*Id.* ¶ 26.)  Plaintiffs allege that Tobias, since April 2011, engaged in that recruiting process with Jazz.  Jazz's Chief Executive Officer Bruce Cozadd identified Tobias as "his first choice for this position."  (*Id.*)  However, he recognized the need to go through a formal recruiting process, and Jazz retained a recruiting firm to commence a search to fill the position in April 2011.  (*Id.* ¶ 27.)  Plaintiffs allege that, according to information they later obtained, Cozadd indicated that recruiting process was "extensive," took place "throughout the spring and summer" of 2011, and involved "multiple meetings" between Tobias and unnamed

---

[3] The parties stipulated to the filing of a First Amended Complaint in this matter shortly after its transfer from the Southern District of New York.  (*See* Dkt. No. 29.)

United States District Court
Northern District of California

members of Jazz's management and board of directors.  (*Id.* ¶¶ 3, 26, 28.)[4]  Plaintiffs further allege that Cozadd said Tobias had been "working together [with Azur Pharma, a company Jazz was acquiring] for some time before [Tobias] came aboard Jazz officially." (FAC ¶ 28.)

On May 9, 2011, NeurogesX filed a Form 10-Q with the SEC.  (*Id.* ¶ 29.)  As part of the "Risk Factors" identified therein, NeurogesX disclosed risks related to retention of key personnel. The May Form 10-Q states:

> "***We depend on our key personnel. If we are not able to retain them, our business will suffer.*** [¶]We are highly dependent on the principal members of our management and scientific staff.  The competition for skilled personnel among biopharmaceutical companies in the San Francisco Bay Area is intense and the employment services of our scientific, management and other executive officers are terminable at-will.  If we lose one or more of these key employees, our ability to implement and execute our business strategy successfully could be seriously harmed.  Replacing key employees may be difficult and may take an extended period of time because of the limited number of individuals in our industry with the breadth of skills and experience required to develop, gain regulatory approval of and commercialize products successfully.  For example, on April 29, 2011, we announced the planned retirement of Anthony DiTonno, our President and Chief Executive Officer, by December 31, 2011.  We initiated a formal executive search for a Chief Executive Officer, however there can be no assurance that our search will be successful in identifying a proper candidate, that a candidate will accept the position on terms acceptable to us or how long such a search will take to perform."

(Defendant's Request for Judicial Notice, Form 10-Q, Exh. 2.)

During the summer of 2011, the Company was soliciting investors for a private placement of its securities.  (FAC ¶ 31.)  Following the late withdrawal of one of the investors in the private placement, on July 17, 2011, NeurogesX approached Maritime to participate in the private placement of the Company's securities.  (*Id.* ¶ 31.)  Maritime alleges that the assurance Tobias would remain with NeurogesX was of key importance to its investment decision, since he was widely regarded as the main driver to any future growth and success of the company.  (*Id.*)

On July 19, 2011, Maritime requested a due diligence call with NeurogesX's management team, including Tobias.  (*Id.*)  Plaintiffs allege that, in response to a direct question, Tobias stated

---

[4]  Plaintiffs allege that, on November 28, 2011, the facts regarding the recruiting process for Tobias were confirmed by Cozadd, Jazz's CEO, in a conversation with Andrew Evans at a conference in New York.  (*Id.* ¶¶ 26, 28.)

that he had no plans to leave the Company.  Plaintiffs further allege, on information and belief, that each of the other investors in the private placement had a similar conversation, either in person or by telephone, with Defendant Tobias and received the same representation.  (*Id.*)  Later, on July 19 or 20, 2011, Tobias repeated his prior representation that he had no intention of leaving the Company.  (*Id.* ¶ 32.) Maritime alleges that Tobias made this representation even though, by this time, he was significantly advanced in the process of leaving NeurogesX for Jazz.  (*Id.*)

On July 21, 2011, the Company entered into the private placement, where it privately sold shares to Maritime and twenty other investors pursuant to a Securities Purchase Agreement.  (*Id.* ¶ 33.)  NeurogesX warranted in the Securities Purchase Agreement ("SPA") that "[t]he Company is not aware that any key employee or significant group of employees of the Company or the Subsidiary plans to terminate employment with the Company."  (*Id.* ¶ 34.)  The SPA became public on July 27, 2011, as an exhibit to a Form 8-K, filed with the SEC.  (*Id.* ¶ 35.)  With the SPA in place, on August 5, 2011, NeurogesX secured a $20 million debt facility.  The debt facility was announced in a Form 8-K filing on August 8th.  Plaintiffs contend that Defendants did not reveal that Tobias was actively looking to leave the Company, since doing so would jeopardize its ability to obtain the debt facility.  (*Id.* ¶ 38.)

On August 15, 2011, the Company filed another Form 10-Q with the SEC, using the exact same key employee "Risk Factor" language as its May 9th filing. (*Id.* ¶ 39.)  Thus, while the statements about DiTonno's departure were repeated, there was no mention of Tobias' recruitment or potential departure in the August 15, 2011 Form 10-Q.

On September 16, 2011, Tobias was formally offered the position of Jazz chief medical officer.  (*Id.* ¶ 42.)  Five days later, on September 21, 2011, Tobias informed NeurogesX of his resignation.  (*Id.* ¶ 43.)

On September 27, 2011, the company filed a press release as well as a Form 8-K with the SEC, announcing that Tobias had resigned his position effective October 15, 2011.  (*Id.* ¶ 44.)  The Form 8-K did not disclose that Tobias had already accepted the position of Senior Vice President of Research and Development and Chief Medical Office of Jazz.  (*Id.*)  On October 31, 2011, NeurogesX announced that it was replacing Tobias with Dr. Stephen J. Petroutka.  (*Id.* ¶ 45.)

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1   The market reacted negatively to Tobias's resignation, and by October 3, 2011, the Company

2   had lost over half its market value.  (*Id.* ¶ 45.)  By February 9, 2012, NASDAQ announced it had

3   halted trading on NeurogesX's common stock.  (*Id.*)

4   Plaintiffs allege that the material misrepresentations and omissions by Defendants prevented

5   investors and analysts alike from knowing the truth about the impending departure of Defendant

6   Tobias, which caused the Company's stock to trade at artificially inflated prices throughout the Class

7   Period, and then to suffer massive declines after Tobias's departure was revealed.  Plaintiffs allege

8   that, had they known that Tobias was planning to leave, they never would have invested in

9   NeurogesX.

10  ## II.    APPLICABLE STANDARD

11  A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in

12  the complaint.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  "Dismissal can be

13  based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

14  cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  All

15  allegations of material fact are taken as true and construed in the light most favorable to the plaintiff.

16  *Johnson v. Lucent Techs., Inc.,* 653 F.3d 1000, 1010 (9th Cir. 2011).  To survive a motion to dismiss,

17  "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

18  plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

19  *Twombly*, 550 U.S. 544, 557 (2007)).

20  In pleading a cause of action for fraud under rule 9(b), "a party must state with particularity

21  the circumstances constituting fraud or mistake; [m]alice, intent, knowledge, and other conditions of

22  a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Similarly, in pleading a cause of

23  action for securities fraud under the PSLRA, "the complaint shall specify each statement alleged to

24  have been misleading, the reason or reasons why the statement is misleading, and, if an allegation

25  regarding the statement or omission is made on information and belief, the complaint shall state with

26  particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b).  However, the PSLRA

27  requires particularity in pleading the required state of mind: "in any private action arising under this

28  chapter in which the plaintiff may recover money damages only on proof that the defendant acted

6

with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.*  Thus the PSLRA requires a plaintiff alleging securities fraud to "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (internal quotation omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); 15 U.S.C. § 78u-4(b)(1)- (2).  The Ninth Circuit has dubbed the pleadings requirements under the PSLRA "formidable" for a plaintiff seeking to state a proper claim and avoid dismissal.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008).

## III.    DISCUSSION

### A.    FEDERAL SECURITIES LAW CLAIMS

#### 1.    *Section 10(b) Claim*

Plaintiffs' Second Count, for Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, is pleaded against NeurogesX only on behalf of all the Classes.  To state a claim under Section 10b, a plaintiff must "show that the defendant made a statement that was '*misleading* as to a *material* fact.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  Thus, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx*, 131 S. Ct. at 1317-18 (quoting *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 157 (2008)).

The NeurogesX Defendants argue Plaintiffs have not alleged any statements that were false when made, nor have they alleged scienter.  Defendant Tobias likewise argues Plaintiffs have not alleged a false or misleading statement or scienter, and also have not pleaded reliance adequately. The Ninth Circuit generally examines the falsity and scienter requirements at the same time, since falsity and scienter are often inferred from the same facts. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 932 (9th Cir. 2003) ("*America*

United States District Court
Northern District of California

*West*"); *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003).  However, the Court will address Defendants' arguments with respect to each element in turn.

### a.      False or Misleading Statement

The heightened pleading requirements of the PSLRA require that a plaintiff "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C.A. § 78u-4; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 321 (2007).  The materiality element requires a showing of a substantial likelihood that disclosure of an omitted fact would have been viewed by the reasonable investor as having "significantly altered the 'total mix' of information" in making investment decisions.  *Basic,* 485 U.S. at 231–232.  "[Section] 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information [,d]isclosure is required under these provisions only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.'  *Matrixx*, 131 S. Ct. at 1321-22 (quoting 17 CFR § 240.10b–5(b)).

Plaintiffs contend that NeurogesX and Tobias made multiple representations that Tobias had no plans to leave the Company, despite Tobias having formed an intent to leave NeurogesX in April 2011.  The specific statements Plaintiffs allege to be false and misleading are:

(1)      May and August SEC Form 10-Q explicit statements by NeurogesX stating that "We depend on our key personnel. If we are not able to retain them, our business will suffer;"

(2)      Tobias's statements on behalf of the Company during due diligence calls on July 19 and 20, 2011, in advance of the July 21, 2011 SPA, that he had no plans to leave the company;

United States District Court
Northern District of California

(3)     the explicit statement by NeurogesX in the July 21, 2011 SPA that "[t]he company is not aware that any key employee or significant group of employees of the Company . . . plans to terminate employment with the Company."[5]

Plaintiffs allege that these statements were false or misleading because they "failed to disclose" that Tobias was "actively seeking to leave NeurogesX for Jazz." (FAC ¶¶ 30, 40.)

Section 10(b) makes it unlawful "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b–5(b); *see also Matrixx*, 131 S. Ct. 1309, 1317; *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1551 (9th Cir. 1994) ("statements, even if literally true, failed to reflect the true condition of the bank, thereby misleading investors"). While Rule 10b-5 and section 10(b) do not make statements actionable merely because they are incomplete, they do forbid omissions that "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Defendants do not contend that statements concerning Tobias's continued employment were not material, but rather that no false or misleading statements were made.

Plaintiffs argue that their allegations create a reasonable inference that some amount of planning occurred well before Jazz's formal offer of employment on September 16, 2011, and NeurogesX's announcement of Tobias's retirement on September 21. Plaintiffs allege that Jazz began recruiting for the position in March 2011, that Jazz's CEO identified Tobias as his "first choice," and that the CEO stated that the recruitment process was extensive throughout "Spring and Summer" of 2011. Tobias is alleged to have had multiple meetings with members of Jazz's management and board of directors and to have begun doing work on behalf of Jazz before he "officially" started work with Jazz in mid-October 2011. Moreover, Plaintiffs assert that the speed with which Tobias's replacement was announced, just over a month from Tobias's resignation, indicates that the Company knew of his planned departure at the time of the above statements.

---

[5] The SPA goes on to define "Company's Knowledge" to mean "based upon the actual knowledge of the executive officers of the Company having responsibility for the matter or matters that are the subject of the statement."

United States District Court
Northern District of California

Plaintiffs' allegations are too vague to meet the exacting standard required under section 10(b).  While Plaintiffs allege that Tobias responded to a direct question by stating that he had no plans to leave, they do not allege precisely what he said.  Moreover, even if he had stated those exact words, Plaintiffs do not allege other facts to give rise to a plausible inference that those words (*i.e.,* that he had no plans to leave) were false or misleading based upon other facts known at the time.  Tobias eventually did form a plan to leave to the Company, that much is established.  However, Plaintiffs do not allege that he formed that plan by the time of his statements on the conference call, or sometime in the two months between the conference call and the alleged date that Jazz made him a formal offer of employment.  Likewise, Plaintiffs do not allege specific facts to indicate what Tobias knew or was planning -- much less what DiTonno and Ghilieri, or anyone else at the Company -- at the time of the May 10-Q filing, the July SPA, or even the August 10-Q filing.  But the timing of Tobias's plans and discussions with Jazz is essential to establishing that the statements cited by Plaintiffs are actionable.  And while the Court agrees that a strong inference that Tobias had "plans to leave" could be established by something short of an actual offer from Jazz and Tobias's resignation from the Company, the fact of his being a top candidate considered in Jazz's recruiting process in the Spring and Summer of 2011 does not create such an inference, nor does an allegation of "multiple" meetings with Jazz management during that general time period or his swift replacement.  As a result, Plaintiffs cannot allege facts to sufficient to create a plausible claim that he had a definite "plan" to leave at the time the statements were made.

Plaintiffs argue that statements such as those made in the Form 10-Qs and SPA are actionable when the company is aware of the planned departure of one of its key employees, citing *Voit v. Wonderware Corp.*, 977 F. Supp. 363, 370 (E.D. Pa. 1997) *abrogated on other grounds by In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999).  The facts in *Voit* are distinguishable.  There, in a press release announcing the hiring of a new President and COO, the company made statements that the current CEO, Morin, would continue on and "was looking forward to working with" Morin, even though the Company had already decided that the new COO would actually replace Morin.  The court there found the press release was actionable as a "misleading half-truth because Defendants knew that Morin would leave and had already hired Slavin to replace him." *Id.* at 370.

United States District Court
Northern District of California

1   Here, by contrast, there are no allegations that Tobias, or anyone else, knew that Tobias would be

2   leaving.

3          In short, the specific factual allegations here do not "affirmatively create an impression of a

4   state of affairs that differs in a material way from the one that actually exists."  *Brody,* 280 F.3d at

5   1006 (statements in press release concerning stock repurchase plan were not misleading for failure to

6   mention a possible company takeover under discussion since press release had not stated or implied

7   anything regarding a takeover).  Plaintiffs knew that all employees, including Tobias, were at-will

8   and that competition for talent in the field was high.  (*See* FAC ¶¶ 29, 39.)  As in *Brody*, while

9   Plaintiffs may have wanted to know that Tobias was being recruited by Jazz, the statements at issue

10  were not rendered misleading by virtue of failure to disclose that fact.  *Brody,* 280 F.3d at 1006-07

11  (information about merger talks may have been "material" to plaintiffs, but failure to disclose those

12  talks did not make company's other statements misleading, since defendant never conveyed that a

13  merger or acquisition would not occur); *see also In re Rigel Pharmaceuticals, Inc. Securities*

14  *Litigation*, 697 F.3d 869, 881 (9th Cir. 2012) ("even if some investors might have wanted more

15  extensive information . . . that would not be sufficient to make the alleged original statements false or

16  misleading").  There are no allegations to the effect that investors asked if Tobias was interviewing

17  or being recruited by anyone, that he planned to stay with the Company for any period of time, nor

18  any other facts alleged that would have made the statements in the due diligence calls, SPA or 10-Qs

19  false or misleading at the time.

20                    **b.      Sufficiency of Scienter Allegations**

21          Even if the allegations here were sufficient to establish a materially false statement, Plaintiffs

22  have not alleged facts sufficient to establish scienter.  In order to make claim under section 10(b), a

23  private securities plaintiff must "state with particularity facts giving rise to a strong inference that the

24  defendant acted with the required state of mind," 15 U.S.C. § 78u–4(b)(2); *see also Tellabs*, 551 U.S.

25  at 321.  That is, the allegations of the complaint must raise "a strong inference that the defendant

26  acted with an intent to deceive, manipulate, or defraud."  *Metzler Inv. GMBH v. Corinthian Colleges,*

27  *Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (citing 15 U.S.C. § 78u–4(b)(2) and *Ernst & Ernst v.*

28  *Hochfelder,* 425 U.S. 185, 193 (1976)) (emphasis added).  The determination of what allegations will

create a "strong inference" of intent to deceive requires the court to consider all the possible inferences supported by the facts alleged, and which inference is more convincing than the others. *Tellabs,* 551 U.S. at 323-24. "A complaint will survive… only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

Generally, "allegations of routine corporate objectives such as the desire to obtain good financing and expand are not, without more, sufficient to allege scienter," nor are allegations that "executive compensation, including stock options and bonuses" were based on achieving corporate goals." *In re Rigel Pharmaceuticals, Inc. Sec. Litig.*, 697 F.3d 869, 882-83, 884 (9th Cir. 2012). Likewise, allegations of motive and opportunity, without more, are insufficient to allege scienter. *See Rubke v. Capitol Bancorp Ltd.,* 551 F.3d 1156, 1166 (9th Cir.2009) (allegations that company had motive and opportunity to acquire shares for strategic and financial gain not enough to establish scienter).

Plaintiffs allege that Tobias told investors that he had no plans to leave the Company, and these statements were made specifically to investors who were considering entering into the SPA to provide an infusion of capital to the Company. Plaintiffs allege securing the SPA agreement meant that the Company was able to obtain, very shortly thereafter, $20 million in additional financing, all while the Company's stock price was still artificially inflated. Thus, Plaintiffs contend that Defendants did not reveal that Tobias was actively looking to leave the Company, since doing so would have jeopardized its ability to obtain the debt facility.

On the other hand, Plaintiffs do not allege facts to suggest Tobias had any financial incentives to hide his recruitment discussions with Jazz, or that he would personally stand to gain from any alleged fraud. There are no allegations that Tobias, or any other individual, sold stock during the period between the alleged misleading statements and Tobias's resignation. In fact, the SPA's lock-up agreement precluded Tobias from selling stock for 90 days thereafter, so he is not alleged to have (and could not have) sold off stock based on the undisclosed information. The lock-up agreement in the SPA applied to DiTonno and Ghiglieri, preventing them from selling stock for 90 days after the close of the agreement as well, such that they suffered along with Plaintiffs when the stock declined.

United States District Court
Northern District of California

The Court further notes that, according to the terms alleged in the complaint, the common stock incentives in Tobias's own amended employment agreement would not have vested for six months, *i.e.* October 24, 2011, and therefore *after* the effective date of his resignation.  Thus, the allegations do not suggest that Tobias waited to reveal a plan to move to Jazz in order to obtain those benefits.  Viewing the allegations holistically, as *Tellabs* teaches, the Court finds that they are insufficient to raise a strong inference that Tobias, the other individual defendants, or anyone else at the Company intended to mislead Plaintiffs.

Accordingly, the Motion of the NeurogesX Defendants to Dismiss the Section 10(b) claim (Count II) against the Company is **GRANTED**.

### 2.      *Section 20(a) Claim*

Section 20(a) of the Act makes "controlling" individuals also liable for violations of section 10(b) and its underlying regulations.  An employee of a corporation that has violated the securities laws is liable along with the corporation so long as the plaintiff demonstrates "a primary violation of federal securities law" and that "the defendant exercised actual power or control over the primary violator." *America West*, 320 F.3d at 945; *Zucco Partners*, 552 F.3d at 990.

As set forth above, the Court finds that the underlying Section 10(b) violation has not been pleaded sufficiently.  The motions to dismiss Count III as to DiTonno, Ghiglieri, and Tobias are **GRANTED**.

### B.      STATE LAW CLAIMS

Plaintiffs' assert three state law claims on behalf of the Private Placement Class.[6]  Count IV pleads a breach of contract claim on behalf the Private Placement Class against NeurogesX and DiTonno.  Count V asserts a fraud claim against all defendants on behalf of investors in the private placement offering.  Count VI alleges liability against Tobias, DiTonno, and Ghiglieri for aiding and abetting the Company's fraud.  Defendants attack the claims on two grounds.  First, they argue that the claims on behalf of the Private Placement Class should be dismissed as preempted under federal

---

[6]  The Court notes that the aiding and abetting count is alleged on behalf of the entire class as well as the Private Placement Class.  Plaintiff concedes that Count VI is improperly pleaded in that it should have been asserted only on behalf of the Private Placement Class.  (Opp'n at 15 n.2.)

securities law.  Second, they argue that all the state law claims should be dismissed as insufficiently pleaded under the standards of Rule 9(b).  The Court first addresses the preemption issue.

### 1.     *Preemption of State Law Claims Under SLUSA*

Congress amended the Private Securities Litigation Reform Act ("PSLRA") in 1998 with legislation entitled the "Securities Litigation Uniform Standards Act of 1998" ("SLUSA") to deal, in part, with its concern over the proliferation of securities' claims brought under state law.  Thus, SLUSA provides that "[n]o covered class action based upon the statutory or common law of any State … may be maintained in any State or Federal court by any private party alleging . . . a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security."  15 U.S.C. § 78bb(f)(1).  With respect to the state law claims at issue then, the inquiry focuses on whether this action falls within the rubric of the term a "covered class action."  Relevant here, the Private Placement Class is alleged to be limited to 21 members.  (FAC ¶ 59.)

The analysis begins with the language of the statute itself.  SLUSA provides three definitions of the term "covered class action": one in subsection (i)(I), the second in subsection (i)(II), and the third in subsection (ii) which notably has two parts (also (I) and (II)).  The statute reads:

(5) Definitions.  For purposes of this subsection, the following definitions shall apply:

***

(B) Covered class action.  The term "covered class action" means -

(i) any single lawsuit in which—

   (I) **damages are sought on behalf of more than 50 persons or prospective class members**, and questions of law or fact common to those persons or members of the prospective class, <u>without reference to issues of individualized reliance on an alleged misstatement or omission,</u> predominate over any questions affecting only individual persons or members*; or*

   (II) **one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated,** and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; *or*

(ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which—

United States District Court
Northern District of California

(I) damages are sought on behalf of more than 50 persons; and
(II) the lawsuits are joined, consolidated, or otherwise proceed as a single
action for any purpose.

15 U.S.C. § 78bb(f)(5)(B) (emphasis supplied and discussed herein).  The parties agree that subsection (ii) does not apply to this action.  The question is whether the action is covered by the definition in either subsection (i)(I) or subsection (i)(II).

As a preliminary matter, subsection (i)(I) does not appear on its face to preclude the action here, since its numerical requirement states that covered class actions are those brought on behalf of "50 persons or prospective class members."  Here, the class is limited to 21 members.  However, subsection (i)(II), on its face, applies to all actions brought on a representative basis on behalf of "other unnamed parties similarly situated," with no stated numerical limitation, meaning that the 21-member class action here would be precluded.  Thus, the debate focuses on the interpretation of subsection (i)(II) and its relationship to subsection (i)(I).

The provisions differ in two ways.  First, the introductory description of the "single lawsuit" differs, *i.e.*: those where "(I) damages are sought on behalf of more than 50 persons or prospective class members" versus those where "(II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated."  Second, subsection (i)(I) also contains the phrase "without reference to issues of individualized reliance on an alleged misstatement or omission" which is absent in subsection (i)(II).  The Court focuses on the introductory language.

The confusion created by the drafting of these provisions stems from the use of "prospective class members" in subsection (i)(I).  On the one hand, subsection (i)(I) defines the "class actions covered" with a numerical threshold of "50" of either "persons or prospective class members."  On the other hand, subsection (i)(II) does not have a numerical threshold but appears to apply to any action brought on a "representative basis," *i.e.* a class action with any number of class members.

Plaintiff argues that the 50-person limitation must apply to both subsections.  If not, the 50-person limitation would have no meaning given that subsection (i)(II) (with no such limitation) would swallow subsection (i)(I).  Plaintiffs rely on *dicta* in a Supreme Court case stating that under Section 78bb(f)(5), "[a] 'covered class action' is a lawsuit in which damages are sought on behalf of

United States District Court
Northern District of California

1   more than 50 people," *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 83 (2006),

2   seeming to read the 50-person requirement from subsection (i)(I) [and subsection (ii)] into subsection

3   (i)(II).[7]  The parties have not cited, nor has the Court found, any other Supreme Court, Ninth Circuit,

4   or other federal circuit court authority touching on the meaning of these two subsections.

5        Defendants counter that both the plain language of the statute and the legislative history

6   demonstrate that subsection (i)(II) was meant to refer to traditional Rule 23 class actions of *any* size

7   and subsection (i)(I) refers to actions brought under other undefined procedural mechanisms.  As for

8   the plain language, defendants argue that a 50-person requirement cannot be read into subsection

9   (i)(II) since it does not exist and the statute separates the two subsections with the disjunctive, "or."

10  They cite district court decisions which rejected efforts to import a 50-person requirement into

11  subsection (i)(II).  *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 02-MD-1335-PB, 2008 WL 489257

12  (D.N.H. Feb. 20, 2008); *Drooker v. Morgan Stanley & Co.*, No. 07-61772-CIVJORDAN at *4 (S.D.

13  Fla. Mar. 26, 2008).

14       As for the legislative history, Defendants argue that SLUSA was meant to be read broadly to

15  prevent plaintiffs from evading the limits of federal securities class action laws by filing claims in the

16  state court, whether as class actions or under other procedural guises such as representative actions or

17  mass torts.  *See* S. Rep. No. 105-182 at 8 (1998) ("[I]t remains the Committee's intent that the bill be

18  interpreted broadly to reach mass actions and all other procedural devices that might be used to

19  circumvent the class action definition.").  Indeed, the Senate Report, on which both sides rely,

20  distinguishes between the two subsections and states:

21       [Subsection (i)(II)] of the legislation provides a definition that closely tracks the
         relevant provisions of Rule 23 of the Federal Rules of Civil Procedure in which a
22       suit is brought by representative plaintiffs on behalf of themselves *and other*
         *unnamed parties*.  [Subsection (i)(I)], however, provides that any single lawsuit is
23       *treated as a class action* if it seeks damages on behalf of more than fifty persons
         and questions of law or fact common to the prospective class predominate,
24       without regard to questions of individualized reliance.  The predominance
         requirement, modeled on Rule 23, is included to assure that claims that are not
25       closely related, but that are included in a single proceeding only for the purposes

26

27   _____

28       [7]  This was the reading espoused by Plaintiffs in their opposition to the motions to dismiss.
     However, they appear to have abandoned this argument in their supplemental briefing on the
     preemption issue.

United States District Court
Northern District of California

> of convenience are not treated as a class action.  The Committee is conscious,
> however, of the danger that the predominance requirement could be used as a
> loophole to bring a single suit that names many plaintiffs.  If such a suit is brought
> under a state law that requires proof of each individual plaintiff's reliance on a
> defendant's alleged misstatement or omission, the necessity of proving reliance
> on an individual basis might mean that common questions would not predominate
> and the suit accordingly *would not be treated as a class action*.

S. Rep. 105-182, 7 (1998) (emphasis supplied). The House Report on the same amendments

similarly stated that the:

> "Class actions" that the legislation bars from State court include actions
> brought on behalf of more than 50 persons, *actions brought on behalf of one
> or more unnamed parties*, and so-called "mass actions"….

H.R. Rep. 105-640, 9 (emphasis supplied). [8]   The Reports evidence Congress's intent that the

amendments to the PSLRA would curb what Congress saw as an alarming rise in state class actions

after the restrictions on federal securities class actions enacted in the original 1995 legislation.  *Id.*

The Senate Report was careful to note that the amendment was ***not*** meant to preclude:

> a trustee in bankruptcy, a guardian, a receiver, and other persons or entities duly
> authorized by law (***other than by a provision of state or federal law governing class
> action procedures***) to seek damages on behalf of another person or entity would not
> be covered by this provision.

S. Rep. 105-182, 8 (emphasis added).

The Court agrees that the legislative history demonstrates Congress's intent to preclude state

court class actions of *any size*.  Given the legislative history and the plain language of the statute, the

Court finds that subsection (i)(II) covers a traditional Rule 23 class action and that subsection (i)(I)

cannot be read to exclude certain class actions of fewer than 50 people, despite the "prospective class

member" language used therein.  Accordingly, the Court will not read a 50-person limitation into

subsection (i)(II).

As an alternative argument, Plaintiffs contend that, in any event, this action is covered under

subsection (i)(I) only because plaintiffs have pleaded (or will plead)[9] "individualized reliance" as to

---

[8] Defendants' misattribute this quote (in their supplemental brief at 4:23-25) to Senate Report 105-182 at 3.  The quoted passage comes, instead, from the House Report in their "*see also*" citation.

[9] Plaintiffs concede that they alleged a fraud-on-the-market theory (*i.e.* no individualized reliance), although they now say that was an error.  (FAC ¶¶ 54, 55; Tr. at 44:15-19.)

17

each class member.  Plaintiffs assert that subsection (i)(II) applies in traditional fraud-on-the-market cases but subsection (i)(I) controls where reliance is pleaded individually.  Plaintiffs' attempt to create a carve-out is misplaced.  Plaintiffs' focus on the phrase "without reference to issues of individualized reliance" does not create a carve-out nor do the cited authorities support that position. At best, Plaintiffs' proffered authorities discuss a rare, if not extinct, class action that could be certified despite individualized reliance issues.[10]  Plaintiffs do not cite authority or legislative history that would support such their interpretation.  The Court is not persuaded that Congress meant to create an exception for this species of class action with subsection (i)(I).

Finally, Plaintiffs raise one additional argument in favor of an interpretation that avoids preemption of their claims: the putative class members here could each bring state law claims against the Defendants and therefore dismissal runs counter to one of the main the purposes of the class action mechanism, conservation of judicial resources.  Again, Congress's stated rationale for the 1998 amendments to the PSLRA was to preempt state court "mass actions and all other procedural devices that might be used to circumvent the class action definition."  *See* S. Rep. No. 105-182 at 8 (1998).  The salutary effect of exempting smaller class actions and avoiding multiple individual state lawsuits filed by fewer than 50 people does not appear to have been a consideration.

Thus, Counts IV (Breach of Contract), V (Fraud), and VI (Aiding and Abetting Fraud) on behalf of the Private Placement Class are preempted by SLUSA and the motion to dismiss the claims is **GRANTED**.

Plaintiffs argue, in their supplemental brief, that the breach of contract claim should not be dismissed to the extent it is brought on behalf of Maritime individually against NeurogesX. However, the claim is alleged to have been brought on behalf of the Private Placement Class only. The motion is therefore granted **LEAVE TO AMEND** to allow Plaintiffs to allege a breach of contract

---

[10]  Plaintiffs cite *Cameron v. E. M. Adams & Co.*, 547 F.2d 473, 477 (9th Cir. 1976) and *Weinberger v. Jackson*, 102 F.R.D. 839, 846 (N.D. Cal. 1984), both of which substantially pre-date the PSLRA and SLUSA.  *Compare Basic*, 485 U.S. at 242 ("[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would … prevent[ ] respondents from proceeding with a class action, since individual issues then would … overwhelm[ ] the common ones"); *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 526 (N.D. Cal. 2009) ("[w]ithout the [fraud-on-the-market] presumption, class certification would be virtually impossible as individual questions regarding reliance would predominate over common questions").

claim on behalf of Maritime individually against the Company, consistent with the remainder of the Order herein.[11]

2.      **Sufficiency of the Allegations Under FRCP 9(b)**

Defendants' arguments as to the sufficiency of Counts IV, V, and VI are moot in light of the above ruling.  However, Defendants also challenge the sufficiency of the allegations in Count I, a claim by Maritime individually for fraud in the inducement of the July 21, 2011 SPA against Tobias and NeurogesX.  Plaintiffs allege that Tobias was the duly authorized agent of NeurogesX and he induced Maritime to execute the SPA based on the false representation that he did not intend to leave the Company.  Plaintiffs allege that Tobias knew the statements were false when they were made and that Maritime justifiably relied on the statements, to its detriment.  The specifics of the allegedly false statements are the same as those stated in connection with the section 10(b) claim.

For the reasons stated above, Plaintiffs allegations are insufficient to state a claim for fraud in the inducement, since they have not pleaded with particularity facts to show that any statement was false or misleading when made.  Therefore the motions by Tobias and by NeurogesX to dismiss Count I are **GRANTED**.

## V.      CONCLUSION

Based upon the foregoing, the Court **ORDERS** that:

(1) the Motion of Defendant Jeffrey Tobias, M.D. to Dismiss Plaintiff's Complaint (Dkt. No. 36) is **GRANTED**;

(2) the Motion of Defendants NeurogesX, Inc., Anthony A. DiTonno, and Stephen F. Ghiglieri  to Dismiss Plaintiffs' Complaint (Dkt. No. 33) is **GRANTED**;

(3) Plaintiffs are given **LEAVE TO AMEND** as to Counts I, II, and III to allege facts sufficient to meet the pleading standards and as to Count IV to allege a breach of contract claim on behalf of Maritime only, to the extent such a claim is viable and not duplicative of Count I.

Plaintiffs shall file their Second Amended Complaint no later than **October 29, 2013.** Defendants shall have 28 days thereafter to file their responses.

_____

[11] The parties agree that the breach of contract claim (Count IV) is not stated properly against Defendant DiTonno, since he is not a party to the agreement.  The motion to dismiss DiTonno from Count IV is **GRANTED** on those further grounds as well.

United States District Court
Northern District of California

The Court further **ORDERS** that this matter be set for a case management conference on **January 13, 2014,** at 2:00 p.m. in Courtroom 5, U.S. District Courthouse, Oakland.

This Order terminates Docket Nos. 33 and 36.

**IT IS SO ORDERED.**

Date: September 30, 2013

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**